UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-14290-CIV-GRAHAM/LYNCH

JAMES E. RUMPH,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,

    Defendant.
_____/


FILED by _____ D.C.
JUN 18 2010
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 18)

**THIS CAUSE** comes before this Court upon an Order of Reference and the above Motion. Having reviewed the Motion and related filings, Response, and administrative record, and having held a hearing on June 15, 2010, this Court recommends as follows:

### BACKGROUND

1. The Plaintiff applied for Title II disability insurance benefits and Title XVI supplemental security income of the Social Security Act in September 2006. His applications were denied initially and after reconsideration. In September 2008, following a hearing, an Administrative Law Judge ("ALJ") rendered a decision finding the Plaintiff not disabled under the terms of the Act. The Appeals Council denied his Request for Review on

Page 1 of 16

August 8, 2009, thereby leaving the ALJ's decision final and subject to judicial review.

2. The Plaintiff claimed disability due to HIV/AIDS, Hepatitis B, and high cholesterol. He claimed numerous different impairments resulting from these conditions such as blurred vision and dizziness, fatigue and weakness, mouth sores, diarrhea, a bad skin condition, joint stiffness and arthritis, left leg pain and numbness, occasional limited shoulder movement, and poor sleep. He also claimed various mental impairments such as poor concentration, poor task completion, depression, frustration over his medical condition, and irritability. He has less exertional ability and less motivation. Two case workers interviewed the Plaintiff. One saw no functioning difficulties, but the other saw some problems with understanding, answering questions, standing, and walking as well as jaundiced eyes.

3. At the time of the hearing, held April 2008, the Plaintiff was 43 years old. He has a tenth grade education. He worked many years as a citrus laborer and then starting around 1998 as a truck driver. As a truck driver he worked doing citrus transport, thrift store pick-up, dumpster pick-up, and gas delivery. He claims a disability onset date of July 21, 2006. He says that by that point, he had become too sick to go to work.

4. Records indicate that the Plaintiff was HIV positive as early as 2002. However medical records do not begin until August

2005 when he went to the Florida Health Centers (hereinafter "health clinic"). He had recently been diagnosed with pneumonia and treated on an outpatient basis. At the health clinic he complained of weight loss. A blood test showed a very high HIV viral load.

5. HIV medication began that September and continued through early 2006. The Plaintiff tolerated the medication well, and he had no complaints. However a health clinic note from April 2006 suggests that he had stopped medication because he had lost Medicaid benefits. The health clinic resumed his HIV medication. Thereafter, in August 2006, he fell hurting his right knee, and he went to the hospital. The condition was non-severe, but the attendant did note the smell of alcohol. Also during this period of time, a blood test showed him to have Hepatitis B but not Hepatitis A or C.

6. A treatment note from September 2006 suggests that he had missed taking his HIV medication, and that October he stated that he had stopped taking one of his medications because he was experiencing fatigue and possibly nausea. Nevertheless, despite the apparent medication non-compliance, his viral load was low. It was also during this time that the diagnosis of AIDS first was given, and AIDS continued to be the diagnosis onwards.

7. Non-examining DDS medical advisors rated the Plaintiff's residual functional capacity ("RFC"). The first found

no impairments whatsoever citing HIV without AIDS; high blood pressure and high cholesterol without end organ damage; and Hepatitis A without cirrhosis. The second advisor rated him capable of medium exertional work citing the physical examinations, the absence of significant opportunistic infection, and the lack of liver dysfunction.

8. In January 2007 the Commissioner sent the Plaintiff to Dr. Edney for a consultative psychological evaluation. The Plaintiff complained of depression and anxiety-related symptoms. He reported a difficult youth, a criminal history, and a history of poly-substance abuse. He had good relations with his family and eight children, but he had no friends. He does housework, watches TV, and reads. No physical impairments were observed, although he was anxious and kept moving about. He was sociable, had normal concentration (although his focus occasionally waned), and had normal cognition and intelligence. However he had some difficulty solving social dilemmas. Dr. Edney diagnosed generalized anxiety disorder with depressed mood. Citing the lack of formal mental health treatment, Dr. Edney's findings, and the daily life activities, a DDS medical advisor found the Plaintiff to have just mild mental impairment.

9. The Plaintiff had developed a persistent rash condition, and in November 2006 hemorrhoids also was diagnosed. Treatment compliance remained a problem. In November 2006 he

declined to take some tests. Between February 2007 and January 2008 he had taken HIV medication only intermittently. Despite not taking medication and despite a diagnosis of uncontrolled HIV, he reported generally feeling well. Better diet was lowering his blood pressure and cholesterol.

10. In February 2008 the Commissioner sent the Plaintiff to Dr. Riordan for a second consultative psychological evaluation. The Plaintiff reported difficulties with his HIV status. The Plaintiff was uncooperative and confrontational, and as Dr. Edney had observed earlier, he was fidgety. He was an unreliable historian, and he exaggerated his symptoms. The doctor was unable to diagnosis the Plaintiff's mental health because of unreliable test results, but he saw no significant mental or emotional impairment caused by his physical health.

11. The Commissioner also sent the Plaintiff to Dr. Cardiff for a consultative physical examination. The Plaintiff stated that a month earlier he had begun a new medication regimen. He complained of occasional fatigue, nausea/vomitting, dizziness, blurred vision, and skin problems. Dr. Cardiff found his CD4 count to be low enough to qualify for an AIDS diagnosis, although it appears that the doctor's diagnosis derived from information given by the Plaintiff rather than from an independent blood test. He diagnosed a variety of other conditions such as possible fungal skin infection, high blood pressure, obesity, and anxiety,

but he saw no direct HIV symptoms. Dr. Cardiff also filled out an RFC questionnaire, and generally speaking, he found the Plaintiff capable of medium work (but no climbing ladders, etc.) with intermittent fatigue being the only noteworthy impairment.

12. The Plaintiff represented himself at the hearing, held April 2008. The Plaintiff complained of fatigue and weakness; medication side-effects such as fevers, headaches, chest pain, skin break-outs, but primarily fatigue; and a general worsening of his overall medical condition. This was consistent with the wide-range of impairments, with a focus on fatigue, that he reported in his application. He did not repeat his allegations of mental impairment, however. As for his daily life activities, he testified that he spends the average day resting. He tries to walk for exercise, and he otherwise tries to stay active. He is occasionally energetic but he soon gives out. In his application he reported doing a fairly broad range of basic life activities albeit to tolerance and with help. He drives and shops. In RFC terms, he stated that he can sit for two hours, stand for an hour, walk for up to two hours, and lift up to 40 lbs.

13. The ALJ rendered his opinion in September 2008. The ALJ found the Plaintiff to have the severe impairments of HIV (but not AIDS) and Hepatitis C. He did not find the Plaintiff's obesity to rise to the level of a "severe impairment" since there was no evidence of "required medical treatment, hospitalization,

or surgical intervention for [it]." He found no evidence at all of Hepatitis B infection and no evidence that Hepatitis A, high cholesterol, and high blood pressure are unresponsive to treatment.

14. The ALJ considered the Plaintiff's ability to perform the four domains of mental functioning. Citing the Plaintiff's statements that he does self-care (made in the application paperwork) and "does everything around the house" (made to Dr. Edney), the ALJ found just mild impairment in daily life activities. Citing the Plaintiff's cooperativeness and rapport with Dr. Edney and his good relationship with his family, the ALJ found mild social impairment. Citing Dr. Edney's observations of good attention and concentration and adequate memory, the ALJ found a mild concentration impairment. Lastly the ALJ counted no episodes of decompensation. Based on these findings and citing the advisory RFC opinion, the ALJ found the Plaintiff's affective/mood disorder to be non-severe.

15. After reviewing the medical record, the ALJ stated his reasons for discounting the Plaintiff's allegations of HIV and hepatits-related disability. The ALJ discounted his allegations of blurred vision and black-outs since he drives. He discounted the allegations of fatigue and weakness based on statements the Plaintiff made in the application paperwork that he does self-care, helps his son get ready for school, assists with housework,

and shops. He relied on Dr. Cardiff's findings and partially on the advisory RFC ratings.

16. The ALJ emphasized the Plaintiff's non-compliance with his anti-retroviral HIV medications, but the ALJ did not explain how that non-compliance contradicts his claim of disability. Presumably the ALJ felt that the Plaintiff had simply refused treatment. However, as the ALJ also acknowledged, often the Plaintiff had nausea from taking Bactrim, one of his medications. Presumably also the ALJ must have felt that the Plaintiff would be less impaired if he was treatment compliant, although the ALJ did not expressly address this point. Despite Dr. Diaz' description of "uncontrolled HIV" and Dr. Cardiff's diagnosis of AIDS, the ALJ found the Plaintiff to have HIV and not the presumably worse condition of AIDS. Regardless of the reason for the treatment non-compliance and regardless of whether he has HIV or AIDS, the ALJ emphasized how the Plaintiff nonetheless has had few health complaints overall. (As for Hepatitis C, the ALJ found the Plaintiff non-compliant with its treatment, as well. However there is no evidence that such treatment was prescribed or that Hepatitis C was even diagnosed in the first place.)

17. Having discounted the Plaintiff's allegations and citing the RFC opinions of Dr. Cardiff and the DDS advisors, the ALJ found the Plaintiff capable of medium work subject to occasional postural activities except for climbing ladders,

ropes, or scaffolds which he can never do. He also limited the Plaintiff to occasional exposure to extreme environmental conditions. Citing the Dictionary of Occupational Titles ("DOT"), which classifies the job of truck drive as medium exertional work, the ALJ found the Plaintiff able to perform that past job. The ALJ therefore concluded that the Plaintiff is not disabled.

18. By October 2008, soon after the ALJ's decision, the health clinic was struggling to keep the Plaintiff in assistance programs, and it was growing frustrated with the Plaintiff's intransigence. He repeatedly refused to fill out paperwork that the clinic needed, being only interested in securing welfare benefits for himself. He refused lab tests and doctor's appointments, and he remained non-compliant with treatment. This resulted in his discharge from two programs, although he still had access to medical care through Medicaid. Despite treatment non-compliance, he remained in general good health. He was encouraged to eat healthfully and to exercise.

19. The Plaintiff resumed treatment in January 2009 followed by a return of fatigue and nausea. His compliance was good, albeit not perfect, and his viral load quickly and substantially fell. On January 27, 2009 the health clinic filled out a Medical Verification Form stating that the Plaintiff has AIDS and is unable to sit or stand for work purposes because of fatigue and poor concentration. However this state of impairment

was not expected to last longer than a year. The Plaintiff remained complaint with medication through March 2009, but he still was refusing to fill out paperwork. That February the Plaintiff was observed to be under the influence, and substance abuse was suspected.

## DISCUSSION

Judicial review of the Commissioner's decision is limited to whether it is supported by substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to more than a scintilla. In other words, it is such relevant evidence that a reasonable person might accept as adequate to support the conclusion reached. See id. at 1440. If the decision is supported by substantial competent evidence from the whole record, a court will not disturb it. Neither may a court re-weigh the evidence nor substitute its judgment for the ALJ's. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). While factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007).

This Court considers first whether the record evidence supports the ALJ's finding that the Plaintiff can do medium

exertional work despite HIV/AIDS. The ALJ did not expressly apply the Listing framework to the Plaintiff's applications, namely, Listings §§ 14.08K and 14.00I1, but this Court finds them helpful to understand the nature of the Plaintiff's condition. Generally speaking, the Listings deem the extent of immune suppression (measured in part by viral loads), the presence of secondary, opportunistic diseases, treatment effectiveness, and treatment side-effects to be important evidence in an HIV/AIDS analysis. Indeed participation in treatment is so important that it is a necessary element to finding Listing-level disability at Step Three of the disability analysis. Thus, when a claimant is not in treatment, his/her condition must be considered at Step Four, which is what the ALJ did.

Three factors are key to resolving the Plaintiff's claim. First is the lack of treatment compliance, which, as noted above, is important to an HIV-based claim. There appears to have been no financial barrier to treatment compliance since it was provided through public assistance programs and Medicaid, and although he did experience adverse side-effects from treatment, doctors did not seem to regard them as especially severe. Second is the fact that the Plaintiff's health remained overall good, even when his HIV was uncontrolled. Indeed, rather than having weight loss or wasting disease, the Plaintiff instead was overweight. This evidence suggests continued overall good health, as confirmed by

the consultative examiner. Third is the difficulty judging the impact of adverse medication side-effects given the lack of consistent treatment compliance. Consequently the record evidence for the time period in question, through the date of the ALJ's decision in September 2008, supports the ALJ's finding.

The record also contains medical evidence dated after the ALJ's decision (but presumably considered by the Appeals Council). This later evidence contains a Medical Verification Form prepared by the health clinic, but it does not necessarily prove disability. Although the form says that fatigue and poor concentration prevent the Plaintiff from being able to sit or stand to work, it is important to note that the clinic limited the duration of these impairments to a year or less. Moreover the later treatment notes document continued problems with treatment compliance and program participation.

This Court turns next to fatigue, perhaps the most consistent of the Plaintiff's disability allegations. In rejecting the presence of a significant fatigue-related impairment, the ALJ cited the Plaintiff's daily life activities. This reason is not persuasive by itself since an ability to perform a basic range of life activities does not necessarily demonstrate an ability to sustain a full workday or workweek. Nevertheless for the reasons discussed above, the ALJ's decision on the whole does support the finding. The HIV Listings suggest

that severe fatigue is more a side-effect of treatment than a direct symptom of the HIV, itself, and there has not been the kind of ongoing treatment to give rise to it. In any event the Plaintiff's health overall has remained good regardless of treatment compliance with little evidence confirming the presence of severe fatigue.

Next this Court considers the ALJ's finding of just mild mental impairment. As with the fatigue analysis, the ALJ relied heavily on the Plaintiff's daily life activities, but when the decision is viewed on the whole, there is additional support for the finding. No treating doctor reported significant mental impairment, and the Plaintiff has undergone no formal mental health treatment. The strongest evidence of mental impairment in the record comes from the consultative examiner, Dr. Edney, who diagnosed generalized anxiety disorder with depression. However the mental status examination was mostly normal. One item of evidence not mentioned by the ALJ further weighs against the Plaintiff's claim. It is the consultative evaluation by Dr. Riordan who found no reliable indication of mental impairment. Also, as with fatigue, the Listings attribute HIV-related mental impairment less to the HIV itself and more to the effects of its treatment. In any event the Plaintiff did not even raise an allegation of mental impairment at the hearing.

The ALJ translated the absence of significant physical or

mental impairment to an RFC for medium exertional work. The ALJ then found the Plaintiff able to return to his past work as a truck driver. In reaching this conclusion, the ALJ relied on the DOT which classifies that job at the medium exertional level. The one flaw with this finding is that the ALJ added two restrictions: he limited the Plaintiff to just occasional postural activities and no climbing ladders, ropes, scaffolds, etc. Thus there is some uncertainty whether the RFC, as assessed, is consistent with the DOT's classification which presumably is for a full range of medium exertion work. However, in the end analysis, this Court does not find this shortcoming sufficient to warrant remand. First the additional two restrictions do not seem to be significant — they still leave the Plaintiff capable of a nearly full range of medium work. Nor do they seem to implicate directly the demands of truck driving. Second the Plaintiff, himself, described a fairly substantial exertional ability also seemingly consistent with medium exertional work.

It also is noteworthy that medium work necessarily implies an ability to perform at the less demanding light and sedentary work levels. See 20 C.F.R. § 416(c). This opens the possibility that the Plaintiff can perform work other than medium work.

As a final matter, in both his Motion and at the hearing, the Plaintiff seems to express concern that the ALJ denied his claim because of other legal proceedings involving him. This

Court sees no indication of such. The record contains no evidence of these proceedings, and the ALJ mentioned none in his decision. Moreover these other proceedings appear unrelated to his health and disability.

## CONCLUSION

The ALJ's analysis is not without its shortcomings. His discussion of the Plaintiff's allegations of fatigue and mental impairment was relatively spartan, as was his vocational finding. However, it is not for this Court upon judicial review to re-weigh the evidence or reach findings of fact de novo; such is the prerogative of the ALJ as the fact-finder in this case. This Court's review is limited to ensuring that the ALJ's findings of fact are supported by competent, substantial evidence and that the decision comports with the governing law and regulations. As the ALJ emphasized, problems with treatment compliance — taking his medication consistently and being cooperative with his health care providers — made it very difficult to measure the degree to which HIV/AIDS impairs his ability to work. Moreover the Listings do not automatically consider someone with HIV/AIDS as disabled, and at least for the time period relevant here, the Plaintiff was, fortunately, in overall good health. Whether the Plaintiff's condition has worsened since September 2008 is beyond the scope of these proceedings. Therefore, having reviewed the parties' arguments and having independently reviewed the record, this

Court finds the decision to enjoy such support with no grounds warranting reversal or remand.

**ACCORDINGLY,** this Court recommends to the District Court that the Plaintiff's Motion for Summary Judgment be **DENIED** and that summary judgment be granted in the Defendant's favor instead.

The parties shall have **fourteen (14) days** from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Donald L. Graham, the United States District Judge assigned to this case.

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this 18th day of June, 2010.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

cc: Hon. Donald L. Graham
    James E. Rumph, pro se
    Stephanie I.R. Fidler, AUSA